Travis Edward Martin
In Pro Per
1746-F South Victoria Ave.
Suite #104
Ventura CA 93003
Email: Martin57290@gmail.com

FILED

CLERK, U.S. DISTRICT COURT

5/24/2026

CENTRAL DISTRICT OF CALIFORNIA

BY ___ag___ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TRAVIS EDWARD MARTIN, an individual;<br><br>　　Plaintiff,<br><br>v.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, a federal agency; JAMES WALD, an individual; NATALIE WALD, an individual; JAYSON COHEN, an individual; AMERICAN LEGACY SOLUTIONS LLC, a California limited liability company; and ELITE SOUND COMPANY LLC, a California limited liability company,<br><br>　　Defendants. | **Case No. 2:26-cv-03714-WLH-DFM**<br>**Judge: Hon. Wesley L. Hsu**<br>**Magistrate Judge: Hon. Douglas F. McCormick**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1) DECLARATORY RELIEF**<br>**(2) BREACH OF IMPLIED COVENANT**<br>**(3) CIVIL RICO**<br>**(4) CIVIL RICO CONSPIRACY**<br>**(5) BREACH OF FIDUCIARY DUTY**<br>**(6) VOIDABLE TRANSACTION**<br>**(7) RESTITUTION / MONEY HAD AND RECEIVED**<br>**(8) CIVIL CONSPIRACY**<br>**(9) INDEMNITY / EXONERATION**<br>**(10) DECLARATORY RELIEF RE COLLATERAL, PROCEEDS, AND TRACEABLE PROPERTY**<br><br>**DEMAND FOR JURY TRIAL**<br>**Filed under Fed. R. Civ. P. 15(a)(1)(B)** |

1

FIRST AMENDED COMPLAINT

## **INTRODUCTION**

1. Plaintiff Travis Edward Martin ("Martin") brings this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). The pleading describes a single, integrated scheme that unfolded in stages. Defendants first wielded threatened accusation, threatened imprisonment, and financial coercion to strip money and property from Martin. They then used that coercive leverage, and the forced absence it produced, to seize, operate, and monetize the very business, assets, collateral, customer relationships, receivables, goodwill, and proceeds that had been Martin's. They left him personally exposed on federal SBA debt secured by the collateral they took or impaired.

2. Martin does not sue over any report to law enforcement, any testimony, the fact of his criminal conviction, or any personal-injury loss. He sues for business and property injuries: the coerced payments and property transfers; the loss of his personal 90 percent ownership and the control, consent, compensation, distribution, sale, guaranty-protection, exoneration, reimbursement, indemnity, and subrogation rights that came with it; the loss of collateral protection; the loss of sale consideration and proceeds; and the traceable money, revenue, collateral, and substitute property that should reduce his federal SBA exposure.

3. The private defendants will likely argue that Natalie Wald's eventual report to law enforcement, and Martin's later conviction, immunize or moot the threatened-accusation scheme. They are wrong about the claim. The wrong pleaded here is the pre-report use of threatened accusation and threatened injury to character as leverage to obtain money, property, business control, and, ultimately, business assets. The later report and the proceedings that followed are pleaded for one purpose only: to establish timing, motive, causation, and the completion of the scheme.

4. Defendants documented and executed the extortionate phase through private communications and payment channels. These included in-person communications, phone calls, text messages, Signal messages, bank transfers, Zelle transfers, Chase

2

FIRST AMENDED COMPLAINT

credit-card charges and payments, Chase rewards points or cash-equivalent benefits, tuition payments, travel and lodging charges, consumer purchases, and other household benefits. Those channels are pleaded to show interstate commerce, to supply the documentary trail, to demonstrate the relationship among the predicate acts, and to trace how money and property were obtained and then converted into business leverage.

5. Martin is a personal guarantor on SBA EIDL Loan No. 5632277910 to Entertainment Technology LLC ("ET"), a loan originally issued in the amount of $106,600.00 and later modified to $270,600.00. The ET loan is in default. As of the SBA statement dated May 15, 2026, the ET loan showed an outstanding balance of $267,022.99.

6. The same scheme impaired collateral connected to Airlink Internet, Inc. ("Airlink"), a separate SBA EIDL borrower wholly owned by Martin. Airlink SBA EIDL Loan No. 5642257908 was issued in the original principal amount of approximately $1,200,000.00, has been in default since approximately 2023, and has been referred to collections with an outstanding balance of approximately $1,700,000.00, including accrued interest and collection costs. Martin's combined SBA exposure is approximately $1,967,022.99 before additional penalties, offsets, fees, and collection costs.

7. The private defendants are not bystanders. James Wald ("James") was Martin's 10 percent minority business partner, ET's operational manager, and Martin's co-guarantor on the ET SBA loan. Natalie Wald ("Natalie") was James's spouse and the Wald household's beneficiary; she performed accounting functions for ET and Airlink before moving those same functions to Elite. Jayson Cohen ("Cohen") supplied the outside capital, the acquisition structure, the business direction, and control over the acquisition resources. American Legacy Solutions LLC ("ALS") supplied or facilitated the capital, credit, structure, and business support. Elite Sound Company LLC ("Elite") received, operated, and monetized the assets, collateral, customer relationships,

3

FIRST AMENDED COMPLAINT

goodwill, receivables, and revenue streams that should have protected both Martin and the SBA-secured debt.

8. This was no ordinary distressed sale. Martin formed ET in or around 2016, financed it himself, and gifted James a mere 10 percent interest. Martin kept 90 percent ownership and the attendant rights to control, management, consent, compensation, distributions, sale proceeds, and collateral protection. James then persuaded Airlink to fund ET's growth, representing that ET would expand and repay Airlink with interest. In 2020 and 2021, Airlink advanced approximately $528,231.37 to ET to buy sound-production equipment at James's direction. At the same time, James insulated himself from personal liability for ET's obligations to Airlink, paid himself a $600.00 per diem, and left Martin with no ET income while Martin plowed his own economic rights back into the company.

9. By November 2022, with Martin removed from the business and unable to negotiate directly, Defendants pressed Donna Martin ("Donna"), acting under power of attorney, to sign a Business Assets Sale Agreement transferring ET's remaining assets to Elite. They told her that ET's value had collapsed because of Martin's incarceration and that an immediate sale was necessary before the value fell further. Those representations were false or materially misleading. ET had not collapsed; it had just posted its strongest revenue year, with approximately $346,000.00 in profit for 2022, and total value of approximately $1,438,000.00 in assets. Defendants nonetheless engineered a sale for only $215,000.00.

10. On June 28, 2023, the SBA received actual written notice that the ET loan was in default, that collateral had been transferred to Elite without authorization, that Elite was operating at 5808 Telephone Road, Suite 200, Ventura, California 93003, that Cohen was James's business partner, that James and Cohen were using equipment securing the ET loan, and that Martin, then serving a life sentence, could not personally recover, preserve, market, transport, sell, or liquidate the collateral. The SBA

FIRST AMENDED COMPLAINT

acknowledged receipt and did nothing. Defendants kept using the collateral, and Martin's SBA exposure remained live.

11. Against the SBA, Martin seeks declaratory relief and damages for breach of the implied covenant of good faith and fair dealing. Against the private defendants, he seeks recovery for civil RICO, RICO conspiracy, breach of fiduciary duty, voidable transaction, restitution, civil conspiracy, indemnity, reimbursement, exoneration, declaratory relief, constructive trust, equitable lien, accounting, and tracing. Martin does not seek, in his individual capacity, entity-only damages divorced from his personal rights, nor does he seek RICO recovery for personal injury, emotional distress, or incarceration itself.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Martin's claims against the United States Small Business Administration ("SBA") under 15 U.S.C. § 634(b)(1), which authorizes the SBA to "sue and be sued" in United States district court and authorizes district courts to determine such controversies without regard to the amount in controversy.

13. Martin seeks no attachment, garnishment, injunction, or similar process against the SBA or SBA property. The relief he seeks from the SBA concerns his own obligations: his guarantor status, discharge, reduction, exoneration, and the contract remedies arising from the SBA's conduct.

14. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Martin's civil RICO claims under 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c).

15. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 in connection with the parties' actual controversies over Martin's SBA guaranty obligations, the SBA's impairment of collateral, the private defendants' possession and use of collateral, and the parties' rights in proceeds and traceable property.

16. This Court has supplemental jurisdiction over Martin's related state-law claims under 28 U.S.C. § 1367(a) because they arise from the same case or controversy

5

FIRST AMENDED COMPLAINT

as the federal SBA and RICO claims. All of the claims share one nucleus of operative fact: the ET SBA loan, the Airlink SBA loan, the personal guarantees, the collateral, the Airlink-funded equipment, the below-value transfer, the diversion and operation of collateral through Elite, the defaults, and Martin's resulting personal exposure.

17. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events or omissions giving rise to the claims occurred in Ventura County, California; ET, Airlink, Elite, and the collateral operated there; Defendants transacted the challenged conduct there; and the diverted collateral was identified at 5808 Telephone Road, Suite 200, Ventura, California 93003.

18. Venue is also proper for the civil RICO claims under 18 U.S.C. § 1965(a) because the RICO defendants reside, are found, have agents, or transact their affairs in this District.

19. This Court has personal jurisdiction over James, Natalie, Cohen, ALS, and Elite. They reside in California, are organized under California law, transact business in California, operate or operated in Ventura County, and purposefully directed the challenged conduct at California and this District.

## **PARTIES**

20. Martin is an individual and a citizen of California. He was the founder, principal financier, 90 percent owner, and controlling person of ET until Defendants stripped him of practical control. As majority owner, Martin personally held the rights of ownership, management, consent, compensation, distributions, sale proceeds, indemnity, exoneration, reimbursement, subrogation, and collateral protection.

21. Martin is a personal guarantor on SBA EIDL Loan No. 5632277910. He was the original borrower signatory on the June 15, 2020 Loan Authorization and Agreement, Promissory Note, and Security Agreement for the original $106,600.00 loan, and a signatory on the July 23, 2021 First Modification, which increased the principal to $270,600.00. Martin executed an Unconditional Guarantee, SBA Form 2128, on or about July 23, 2021.

6

FIRST AMENDED COMPLAINT

22. Martin is also the sole owner, borrower, and guarantor on Airlink SBA EIDL Loan No. 5642257908, issued in the original principal amount of approximately $1,200,000.00. That loan has been in default since approximately 2023 and has been referred to collections with an approximate outstanding balance of $1,700,000.00, including accrued interest and collection costs. Martin pleads the Airlink facts for four reasons: Airlink-funded equipment was folded into ET's asset base; Defendants took or used Airlink-financed collateral; the Airlink default triggered cross-default issues under the ET loan documents; and those facts bear directly on Martin's personal SBA exposure.

23. Martin is currently serving a life sentence in state prison. That incarceration physically prevents him from accessing, inventorying, repossessing, transporting, marketing, selling, preserving, liquidating, or accounting for ET collateral or Airlink-financed equipment. Martin does not plead his incarceration as a free-standing excuse. He pleads it because it left the SBA as the only party with both the legal authority and the practical ability to pursue the identified collateral once it received written notice.

24. Defendant SBA is a federal agency with its principal office in Washington, D.C. The SBA is the direct lender and creditor on ET SBA EIDL Loan No. 5632277910 and holds a perfected security interest in ET's business assets under the Security Agreement, the Amended Security Agreement, and a UCC financing statement.

25. Defendant James Wald is an individual and a citizen of California. He was Martin's 10 percent minority business partner, an ET member, ET's operational manager, and a co-guarantor on the ET SBA loan. James was added as a signatory on the July 23, 2021 Amended Loan Authorization and Agreement, First Modification of Promissory Note, and Amended Security Agreement, and he executed an Unconditional Guarantee for the ET loan.

26. Defendant Natalie Wald is an individual and a citizen of California. She is James's spouse and household member. Natalie performed accounting functions for ET, began working for Airlink in or around 2017, and had access to the financial information

FIRST AMENDED COMPLAINT

of both companies. She participated in the threatened-accusation and payment-extraction phase, received and retained the benefits it produced, and later helped run Elite's operations and finances, handling bookkeeping, accounts receivable, accounts payable, check signing, customer-facing work, and general business support.

27. Defendant Jayson Cohen is an individual who resides in California and conducts business in Ventura County, California. Cohen is James's business partner and a co-founder, co-owner, member, principal, manager, or controlling participant of Elite. He also owns and controls ALS. Cohen supplied the capital, credit, acquisition structure, business direction, and operating support that made the takeover, and the later monetization of ET's assets and Airlink-financed equipment, possible.

28. Defendant American Legacy Solutions LLC is a California limited liability company owned and controlled by Cohen. At all relevant times, Cohen acted for ALS as its owner, manager, managing agent, and authorized representative. ALS was no passive entity. It supplied or facilitated the capital, credit, accounts, resources, structure, business support, office support, and operating capacity for the acquisition and monetization of the business and collateral.

29. Defendant Elite Sound Company LLC is a California limited liability company with its principal place of business at 5808 Telephone Road, Suite 200, Ventura, California 93003. James and Cohen formed, capitalized, owned, controlled, and used Elite as the vehicle to acquire and operate the assets, collateral, customer relationships, receivables, goodwill, and revenue streams formerly belonging or traceable to ET, the Airlink-funded equipment, and Martin's personal economic rights.

30. At all relevant times, each private defendant acted both individually and as an agent, aider and abettor, co-conspirator, joint venturer, ratifier, managing agent, principal, alter ego, transferee, or beneficiary of one or more other defendants, in the phase-specific roles alleged here. These agency, conspiracy, alter-ego, and ratification allegations are pleaded only to the extent each defendant's role, knowledge,

8

FIRST AMENDED COMPLAINT

participation, receipt, retention, use, control, concealment, ratification, or monetization of the money, collateral, proceeds, or property supports them.

## GENERAL FACTUAL ALLEGATIONS

**A. Martin Created, Funded, and Controlled ET; James Received Only a Minority Interest**

31. Donna introduced Defendants to Martin in approximately 2010. The Walds were in the sound and music business, and James also worked as an electrician.

32. In or around 2016, Martin formed ET. He then invited James into the business and gifted him a 10 percent interest, keeping 90 percent for himself. James was never an equal partner. He was a minority member who had access to the business only because Martin created, funded, and built it.

33. Martin financed ET himself. His 90 percent majority interest carried personal rights of ownership, control, management, consent, compensation, distributions, sale proceeds, and other economic benefits. Those rights belonged to Martin personally, and they were the target of Defendants' later takeover.

34. Natalie handled ET's accounting. That role gave her access to financial information about ET's revenues, expenses, equipment, purchases, customer activity, operating performance, and overall value. Natalie therefore knew, or could readily learn from the records in front of her, whether ET was declining or thriving.

35. Natalie's sworn testimony confirms the depth of her financial role and access. Natalie testified that she kept the books for ET, that her duties were to pay the bills and cut checks, that she signed checks on ET's account, that she used and maintained ET's QuickBooks accounting system, and that she reconciled the company's records to identify which payments corresponded to which shows. She further testified that she received compensation and benefits through the business, including having the Wald household's cell-phone and car-insurance expenses paid through the company. This insider access placed Natalie in a position to know ET's true financial condition and value and later enabled the continuity of operations through Elite alleged below.

FIRST AMENDED COMPLAINT

36. In or around 2017, Natalie also began working for Airlink, another company Martin owned. That role gave her further access to information about Airlink's finances, the Airlink-funded equipment, and the transfers and advances flowing between Airlink and ET.

37. James told Martin he could help ET grow and generate more revenue. He represented that, if Airlink financed ET's expansion, ET would become a major production company and repay Airlink with interest.

38. In 2020 and 2021, Airlink advanced approximately $528,231.37 to ET to buy sound-production equipment at James's direction. These were not abstract accounting entries. The advances bought tangible sound equipment and operating assets that enlarged ET's asset base, expanded its revenue capacity, increased its collateral value, and improved its ability to perform production work.

39. James and Martin entered oral agreements covering the Airlink advances. James represented that the proceeds would buy equipment, expand ET, and repay Airlink with interest. Martin authorized the advances because James assured him that ET's growth would benefit ET, Airlink, and Martin's own ownership and guaranty position.

40. James then deliberately walled himself off from responsibility for the very growth he had requested. He drafted later transaction documents stating that he would assume no individual liability for ET's obligations to Airlink, even as he continued to control and profit from the equipment and revenue capacity those Airlink advances had funded.

41. On information and belief, James planned all along to capture the benefit of the Airlink-funded equipment and business growth for himself and Elite. He encouraged Martin to authorize the advances, ensured he would never personally answer for ET's debt to Airlink, and then redirected the equipment, business opportunities, customer relationships, and revenue capacity those advances created into the later Elite operation.

FIRST AMENDED COMPLAINT

42. During his tenure as an ET owner and operator, James paid himself a $600.00 per diem. Martin drew no income from ET. Instead, Martin reinvested the proceeds and economic benefits he was owed back into the company, building its equipment value and supporting the business. Defendants later stripped away the very value Martin had deferred and reinvested.

**B. The ET SBA EIDL Loan, Modification, Guarantees, and Collateral**

43. On or about June 15, 2020, the SBA issued COVID-19 EIDL Loan No. 5632277910 to ET in the original principal amount of $106,600.00. The SBA loan documents misspelled the company name as Entrainment Technology LLC. The correct legal name is Entertainment Technology LLC.

44. On or about July 23, 2021, the SBA and ET executed a First Modification of the ET loan, raising the principal to $270,600.00. As part of that modification, James was added as a signatory on the Amended Loan Authorization and Agreement, the First Modification of Promissory Note, and the Amended Security Agreement.

45. As a condition of the modified loan, the SBA required personal guarantees from ET's members. Martin and James each executed an Unconditional Guarantee, SBA Form 2128, for the ET loan.

46. The Security Agreement and Amended Security Agreement granted the SBA a security interest in all of ET's business assets, including tangible and intangible personal property, equipment, inventory, accounts receivable, proceeds, and after-acquired property, wherever located and whether then owned or later acquired. The SBA perfected that interest by filing a UCC financing statement.

47. The ET loan documents barred ET from selling, transferring, leasing, or disposing of collateral without the SBA's prior written consent, except for ordinary inventory turnover in the ordinary course of business. Any unauthorized transfer of collateral was an event of default.

48. The ET monthly payment is $1,368.00. Returned payments, delinquency, cross-defaults, unauthorized collateral transfers, and the cessation of business operations

FIRST AMENDED COMPLAINT

each matter independently, because each one increases Martin's personal exposure and erodes the value of the collateral that should reduce or eliminate it.

49. The loan documents also armed the SBA, upon default, with the right to accelerate the debt, take possession of the collateral, sell or dispose of it, require an accounting of proceeds, and otherwise act to protect the collateral or collect what was owed. Those remedies took on unique importance after Martin's incarceration, because Martin could no longer exercise them himself.

50. The collateral was not merely ET's property in the abstract. It was the repayment source that protected both Martin's guarantor position and the federal lender's secured position. By taking and continuing to use that collateral, Defendants inflicted direct, personal, business and property injury on Martin, over and above any injury to ET.

**C. The Airlink SBA EIDL Loan, Airlink-Funded Equipment, and Cross-Loan Exposure**

51. Martin owns 100 percent of Airlink and is the sole borrower and guarantor on Airlink SBA EIDL Loan No. 5642257908. The loan's original principal amount was approximately $1,200,000.00.

52. A substantial portion of the Airlink EIDL proceeds was loaned, advanced, invested, or deployed by Airlink into ET to purchase additional sound-production equipment and build ET's asset base. The Airlink advances alleged here total, at a minimum, approximately $528,231.37.

53. The Airlink-funded equipment became part of the operating asset base that Defendants later transferred, retained, operated, commingled, and monetized through Elite. That equipment was stored and operated alongside ET's other equipment, forming one commercial sound-production platform that Defendants captured whole.

54. When Defendants diverted ET's assets to Elite, they took or exploited not only the assets securing the ET loan but also assets financed by Airlink or tied to the Airlink loan. The same scheme thus impaired two federal repayment sources at once: the ET

FIRST AMENDED COMPLAINT

collateral backing the $267,022.99 ET balance and the Airlink-funded collateral backing the approximately $1,700,000.00 Airlink collections exposure.

55. The Airlink facts establish Martin's personal injury, standing, traceability, redressability, and damages. Martin does not seek, in his individual capacity, to recover entity-only Airlink damages. He seeks relief for his own guarantor exposure, his own subrogation and exoneration rights, his own economic rights, and the collateral value that should reduce or eliminate the federal debts for which he is personally liable.

56. The Airlink default also matters under the ET loan documents themselves. The ET Note treats a default on any other SBA loan as an independent event of default. The Airlink default therefore triggered a cross-default under the ET loan, separate from the unauthorized transfer of ET collateral and separate from nonpayment.

57. Defendants' use of the Airlink-funded equipment magnified Martin's injury, because Airlink's SBA exposure was already in collections while Elite ran the same equipment and platform. Each month that Defendants retained or monetized that equipment widened the gap between the collateral value that should protect Martin and the federal debt he actually faces.

58. The ET and Airlink collateral allegations belong together because Defendants treated the assets as a single operating sound-production platform, commingled and used them as one, and then monetized the whole through Elite and ALS. Equity demands tracing through that commingled platform, not an artificial separation that would reward Defendants for having mixed the assets in the first place.

**D. The Threatened-Accusation and Coerced-Payment Phase**

59. From at least April 2019 through November 5, 2021, Natalie repeatedly used threatened accusation, threatened injury to Martin's character, and threatened imprisonment to extract money, property, and financial benefits from him. James knew of the threats, took the benefits they produced, pressed for more, and ratified the scheme.

60. The property demanded and obtained spanned cash payments and transfers, Zelle transfers, private-school tuition for the Wald children, travel, lodging,

13

FIRST AMENDED COMPLAINT

entertainment, consumer goods, household goods and services, credit-card charges, payments on Chase credit-card accounts, rewards points and other cash-equivalent points, and other living expenses. In all, the transfers included approximately $100,000.00 in cash, plus substantial additional tuition, compensation, goods, services, travel, lodging, rewards points, and household benefits.

61. What made the scheme extortionate was the coupling: every demand for money or property came yoked to a threat to accuse Martin and destroy his character. Natalie conveyed, again and again, that one phone call would ruin him and that her accusation would be believed over his denial.

62. Natalie told Martin: "I'll get you sucker. One phone call is all it will take. My tribe is bigger than yours. Who do you think they'll believe?" She also used the phrase, "Nobody's going to make a canoe out of me," which she explained to mean that no one would make a fool of her, and that if she was going down, the other person was going down too.

63. Natalie confirmed the substance of these threats under oath. Testifying in the related criminal proceeding, Natalie acknowledged that she used the phrase "nobody's going to make a canoe out of me," and she explained that it meant "nobody's going to make a fool out of me, nobody's going to make me go down because they're going down." Natalie further testified that she told Martin she could and would get the police involved, and she conceded that, because Martin had a prior history she knew about, she understood the threat to report him "carried some weight" and would be of "concern" to him. Natalie's sworn admissions confirm the coercive character of the demands pleaded above.

64. Natalie delivered the demands through private channels: in-person discussions, phone calls, text messages, and Signal messages. The Signal messages matter because they show private, direct, nonpublic threats and demands, not petitioning activity or public commentary.

14

FIRST AMENDED COMPLAINT

65. Natalie's testimony confirms the private, nonpublic, and concealed character of these communications. Natalie testified that the parties communicated through the Signal application, that the parties used Signal so messages could be confirmed as read across different phone platforms, and that Signal was used because it was encrypted so the communications "couldn't be listened in on" and the parties "could speak freely." She further testified that numerous Signal messages in the relevant exchanges were thereafter deleted. These sworn facts confirm that the demands and related communications traveled through private, deliberately concealed channels, not through any petitioning activity or public commentary.

66. The payments and benefits are traceable through bank records, Zelle records, Chase account statements, Chase credit-card reports, rewards-points records, tuition invoices, school payment records, travel and lodging receipts, merchant records, cash-withdrawal records, vendor invoices, and household purchase records. Those records will show that the transfers were economic benefits extracted through fear, not gifts, ordinary family assistance, or unrelated business payments.

67. Each time Natalie renewed the threat, the price was immediate or continued economic support. Martin did not give these transfers freely. He paid because Natalie threatened an accusation that would destroy his character, his personal and business relationships, his control of the business, and its value, all before any tribunal could weigh the truth.

68. On or about April 11, 2019, Natalie threatened accusation and injury to Martin's character unless he kept providing financial support. Martin then paid tuition installments, cash, household expenses, travel expenses, credit-card charges, and related benefits for the Wald family, through cash, bank transfers, Zelle, Chase credit-card payments, and points or cash-equivalent benefits according to proof.

69. On or about September 26, 2019, Natalie renewed the threats during another dispute over money. Martin then paid further tuition, consumer purchases, travel charges, cash, credit-card charges, and household benefits.

15

FIRST AMENDED COMPLAINT

70. In or about January 2020, Natalie continued the scheme. Martin kept paying cash, tuition, goods, services, credit-card charges, points or cash-equivalent benefits, and travel expenses for the Wald household.

71. On or about July 30, 2020, Natalie made additional threats tied to continued support. Martin then funded travel, lodging, household purchases, and related expenses, including a week-long Anaheim trip, through bank, card, cash, points, or other payment channels according to proof.

72. In or about October 2020, Natalie again paired threatened accusation with monetary demands. Martin then paid cash, travel expenses, goods, services, household items, and related credit-card or payment benefits.

73. On or about June 28, 2021, Natalie renewed the scheme and extracted additional cash, goods, services, travel expenses, tuition payments, rewards points, and other payment benefits from Martin.

74. From approximately October 31 through November 3, 2021, Natalie and James kept pressing for money and benefits. Martin told them there would be nothing more, and that he intended to impose additional restrictions under the parties' governing agreements and ownership arrangements, because the Walds would not stop demanding money and benefits, including a demand that Martin buy Natalie a Tesla Model Y.

75. Natalie's own sworn testimony confirms that the threat to accuse came before any disclosure and was wielded for leverage during a money dispute. Natalie testified that, during an argument with Martin in October 2021, and before Payton had told her anything, she accused Martin and raised the prospect of involving the police. She conceded under oath that this statement was "a threat" and agreed that "if you didn't know he did something and Payton hadn't told you he had done something, it would be a threat to say I'm getting the cops involved." This sworn admission establishes that the accusation functioned as coercive leverage, untethered to any contemporaneous belief that abuse had occurred, exactly as alleged in this pleading.

FIRST AMENDED COMPLAINT

76. On the evening of November 3, 2021, just after Martin cut off future support, Natalie asked him: "If something happens to you how do we get the company?" The question laid bare the link between Martin's forced removal and the Walds' designs on his business.

77. On November 5, 2021, less than 36 hours after Martin announced that no further benefits would flow, Natalie made good on the threat and reported sexual-abuse allegations to law enforcement. The wrong alleged here is not that report. The wrong is that, long before any report, Natalie used threatened accusation and threatened injury to character as leverage to obtain money, property, and business advantage, and that James knowingly accepted and ratified the resulting benefits.

78. The dates and the money motive pleaded above are independently corroborated. Evidence has been filed with the court, which states that the demands and the threatened-accusation episodes occurred on the specific dates alleged here: April 11, 2019; September 26, 2019; January 2020; July 30, 2020; October 2020; June 28, 2021; and November 5, 2021. That same evidence states that on November 3, 2021, Martin declared "there will be nothing financial between us," that Martin was thereafter blocked from ET, and that within approximately 36 hours Natalie was "talking to the cops." The evidence on file further states that the dispute was, in substance, about money and the continued financial support and lifestyle Martin had been providing to the Wald household. This documentary trail aligns precisely with the predicate-act chronology and the pay or accuse motive alleged throughout this pleading.

79. The same chronology exposes why Defendants' anticipated defense fails. Martin does not sue because a report was made or because allegations were later litigated. He sues because the threats and demands came first, the payments followed, the money stopped, the report came within roughly 36 hours, and Defendants then exploited his absence to seize the business and the collateral.

80. California law treats a threat to accuse a person of a crime, expose disgrace, or injure character as menace or extortion when it is coupled with a demand for money or

17

FIRST AMENDED COMPLAINT

property. See Cal. Civ. Code §§ 1566, 1567, 1569, 1570; Cal. Penal Code §§ 518, 519, 523, 524; Morrill v. Nightingale, 93 Cal. 452, 456 (1892); Tran v. Nguyen, 97 Cal.App.5th 523, 525-531 (2023); Flatley v. Mauro, 39 Cal.4th 299, 326-333 (2006).

81. The Court of Appeal, Second District, Division Six held that Natalie's later report to law enforcement did not "propagate backward in time" to cloak the earlier menace as protected activity, and it invoked Morrill's rule that, for threats of injury to character, "it is entirely immaterial whether such person is guilty or innocent of the crime to be charged."

82. The threatened-accusation phase caused direct business and property injury before any business sale ever occurred. Martin parted with money, tuition payments, travel payments, Chase charges, points, goods, and services. Those transfers are independently recoverable as property injuries, and they also establish the predicate acts, the enterprise's history, the motive, and the leverage for the takeover that followed.

83. That same phase supplied the leverage for the asset-seizure phase. The Enterprise used fear and timing to take Martin's money first, then used his forced absence to take the business, the collateral, and the revenue platform.

84. That the threatened accusation later led to a criminal prosecution, true or adjudicated, does not defeat the claims alleged. None of these theories turns on the falsity of the later accusation. Each turns on the wrongful use of threatened accusation and threatened injury to character to obtain money, property, or business value.

**E. Expansion Into a Business, Collateral, and Asset Takeover**

85. The scheme did not stop at cash, tuition, travel, goods, points, credit-card charges, and household benefits. Once Martin was removed from ET and physically unable to manage it, James and Natalie set out to exploit the very absence they had threatened to create.

86. Within days of Martin's arrest, James and Natalie were already seeking financing to take the company. Natalie's November 3, 2021 question about how the

FIRST AMENDED COMPLAINT

Walds would get the company if something happened to Martin found its answer in the conduct that followed.

87. Natalie's sworn testimony confirms that the effort to acquire the business began within days of Martin's arrest. Natalie testified that her husband talked to her about wanting to buy ET, that the idea was to "buy Mr. Martin out," and that this occurred after Martin was taken into custody. Asked how soon after the arrest the plans to purchase ET began, Natalie testified, "I'm sure days." She further acknowledged telling an acquaintance, within a couple of days of the arrest, that the family intended to buy ET, and she testified that an inquiry was made about obtaining a loan to acquire the company. This sworn account corroborates that Defendants moved to seize the business almost immediately after engineering Martin's removal, consistent with the November 3, 2021 question alleged above.

88. James and Natalie could not secure enough financing or credit on their own to acquire the business on ordinary terms. So they turned to Cohen, the outside capital source, acquisition participant, and operator who could make the takeover happen.

89. Cohen did not arrive as a stranger to an arm's-length purchase. He was recruited precisely because James and Natalie needed capital, structure, credit, and a controlled vehicle to exploit Martin's forced absence, buy the business at a distressed price, and redirect the consideration, collateral, receivables, goodwill, customer work, proceeds, and future revenue to themselves.

90. By no later than November 2021, and earlier according to proof, Cohen was acting in concert with James and Natalie. He owned and controlled ALS, deployed ALS capital and resources in coordination with the Walds, and became a co-owner, principal, or controlling participant of Elite alongside James.

91. Acting through ALS and in concert with the Walds, Cohen financed, structured, and facilitated the takeover, including the formation, capitalization, and operation of Elite as the vehicle through which the business, collateral, equipment,

19

FIRST AMENDED COMPLAINT

customer work, receivables, revenues, goodwill, and traceable proceeds would be acquired, held, operated, routed, and monetized.

92. Cohen did more than write checks. He exercised business judgment and control over how ALS resources and credit would be used, whether Elite would be capitalized and owned to seize the opportunity created by Martin's removal, which assets and customer relationships would be captured, and how the diverted business would then be run and monetized.

93. On information and belief, ALS funds, credit, accounts, resources, office support, and other capital arranged or controlled by Cohen were used to capitalize Elite, sustain its operations, and position it to seize the business and opportunities that Defendants knew Martin alone had the right to control or monetize.

94. Cohen expected, and ALS and Elite were built to capture, ownership, revenue, profits, commissions, and other economic benefits from the takeover. Defendants did not aim at temporary exclusion. Their objective was to convert Martin's forced absence into a permanent transfer of the business platform, the customer base, the equipment, the receivables, the contracts, the vendor relationships, the goodwill, and the future income stream.

95. Throughout 2022, James, Natalie, Cohen, ALS, and Elite operated as a coordinated unit, each with a defined role. James furnished inside access to ET, its assets, customers, records, and opportunities. Natalie furnished the prior coercive leverage, the timing, the accounting knowledge, the financial records, and the operational continuity. Cohen furnished outside capital, business direction, and acquisition participation. ALS furnished capital, credit, and structure. Elite served as the repository and operating shell for the assets, jobs, customers, receivables, goodwill, equipment, and revenue stream.

96. Through that coordination, Defendants converted Airlink-funded equipment, ET collateral, Martin's deferred economic rights, and the customer base into a

20

FIRST AMENDED COMPLAINT

continuing revenue stream for Elite, all while Martin remained personally exposed on the federal SBA debts tied to that very collateral.

97. The sequence was no coincidence. The threatened-accusation demands stopped yielding money when Martin cut off support; the report followed; Martin became unable to manage the business; James and Natalie sought financing; Cohen and ALS supplied the missing capital and structure; Elite became the acquisition and operating vehicle; and the business and collateral changed hands for a fraction of their worth.

**F. The November 2022 Misrepresentations, Pressure on Donna, and Below-Value Transfer**

98. After Martin was convicted and could no longer negotiate his own affairs, Donna acted as his agent under power of attorney and held practical control over the ET interest on his behalf. Defendants exploited that vulnerability.

99. In November 2022, before the sale documents were executed on or about November 26, 2022, Defendants approached Donna and represented that ET's value had plummeted because of Martin's incarceration, that ET had to sell its assets to them before the value dropped further, and that an immediate sale to Elite was necessary.

100. Those statements were false or materially misleading. Defendants knew ET's value had not collapsed because of Martin's incarceration. They knew ET had just enjoyed one of its strongest years, with approximately $346,000.00 in profit for 2022, and that it still held substantial value in equipment, customer relationships, receivables, goodwill, operational know-how, and ongoing sound-production work.

101. Those who knew the truth included James, who had insider access to ET's operations, customers, and assets; Natalie, who kept ET's books; Cohen and ALS, who were supplying the capital, structure, and acquisition participation; and Elite, which was being positioned to acquire and run the same assets on the strength of that false distressed-value story.

21

FIRST AMENDED COMPLAINT

102. Donna had no independent means of valuing ET's assets, equipment, receivables, goodwill, customer relationships, and ongoing business. She could not meaningfully confer with Martin, who was incarcerated and unable to negotiate. Defendants knew Donna was distressed, isolated, and operating without Martin's guidance, and they used it.

103. James, Cohen, and Elite repeatedly pressured Donna and manufactured urgency to force the sale into the November 2022 window, knowing she could not confer with Martin and lacked the financial information to test their value narrative. Natalie and ALS advanced the same plan by supplying accounting knowledge, business support, capital, structure, and ratification of the acquisition and operating scheme.

104. On or about November 26, 2022, Defendants procured Donna's signature on a Business Assets Sale Agreement, Asset Purchase Agreement, or similar instrument transferring ET's remaining business assets to Elite. The transaction handed Elite the very platform Defendants had already positioned it to operate.

105. The consideration was grossly inadequate. Defendants took the assets for only $215,000.00. At the time of sale, ET had a book value of approximately $1,438,000.00. The $215,000.00 price was a distressed and indefensible fraction of value.

106. The $215,000.00 sale and the related discounted transfers stripped Martin of sale consideration, control, consent rights, compensation, distributions, collateral protection, and traceable proceeds. They also gutted the SBA collateral base and shifted the practical repayment burden onto Martin and the other guarantor and borrower obligations.

107. The November 2022 transfer was no separate, unrelated transaction. It was the culmination of the same course of conduct that began with threatened-accusation-for-money demands, continued through James's acceptance and ratification of those benefits, expanded through Cohen's financing and the ALS/Elite acquisition structure,

FIRST AMENDED COMPLAINT

and ended with the below-value transfer and the ongoing monetization of the same assets and collateral.

108. Because the transfer targeted Martin's majority ownership and his control, consent, compensation, distribution, sale, and guaranty-protection rights, it injured Martin directly. His injury includes the gap between what his rights and collateral protection should have commanded and what Defendants paid, plus the continuing revenue, proceeds, and collateral value Defendants kept.

109. Defendants' own conduct gave the lie to their value narrative. Had ET truly collapsed with Martin's incarceration, Elite could not have kept servicing customers, preserving vendor relationships, running the equipment, collecting receivables, and operating the same sound-production business. The post-transfer revenues and customer work confirm that the distressed-value story was false or materially misleading when Defendants told it.

**G. Unauthorized Diversion and Continuing Use of SBA Collateral**

110. While Martin was incarcerated and unable to oversee ET, James, aided by Natalie, Cohen, ALS, and Elite, removed, transferred, retained, operated, and converted ET's business assets, including equipment, customer relationships, accounts, receivables, goodwill, operational know-how, and other personal property constituting SBA collateral.

111. That transfer of collateral occurred without the SBA's prior written consent, without reasonably equivalent value, and with full knowledge that the assets secured the ET SBA loan and protected Martin's guarantor position.

112. The assets diverted to Elite included all or substantially all of ET's business assets securing SBA EIDL Loan No. 5632277910, together with the Airlink-funded assets stored and operated alongside them. That diverted base included commercial sound-production equipment, tools, customer and vendor relationships, confidential business information, jobs, receivables, opportunities, and goodwill.

FIRST AMENDED COMPLAINT

113. Elite carried on the same or substantially the same sound-production business, using ET's equipment, the Airlink-funded equipment, the customer relationships, the jobs, the receivables, the vendor relationships, the goodwill, the operational know-how, and the revenue stream. In short, Elite used the collateral to generate revenue while the SBA loan went unpaid and Martin stayed personally exposed.

114. Natalie moved her bookkeeping, accounts-receivable, accounts-payable, check-signing, customer, and operational support functions from ET to Elite. Her insider knowledge of ET's finances, customers, pricing, records, vendors, and payment practices let Elite continue ET's business with barely a disruption.

115. James and Cohen jointly operated and controlled Elite using the diverted assets. Cohen and ALS took part in financing, capitalizing, structuring, collecting, routing, retaining, and monetizing the assets, collateral, customer relationships, receivables, revenues, and substitute proceeds.

116. Defendants used the diverted assets to service customers, generate revenue, collect receivables, preserve customer relationships, and profit from music-festival sound-production services and related commercial work. Every dollar the diverted assets earned was value that should have been preserved, returned, or applied to reduce the SBA loans and Martin's personal exposure.

117. Defendants' retention and continued use of the collateral caused continuing injury. It let the collateral depreciate, commingle, and lose traceability, and it generated revenue for Defendants instead of paying down the SBA debts. With every passing month, the SBA's security position weakened and Martin's guarantor position grew more exposed.

118. The injury is ongoing. Defendants continue to possess, use, collect revenue from, and control the collateral, the proceeds, the substitute proceeds, the customer goodwill, the business opportunities, the receivables, and the records needed to trace

FIRST AMENDED COMPLAINT

value. Martin cannot capture the full measure of that collateral value without an accounting, tracing, a constructive trust, an equitable lien, and declaratory relief.

### H. Multiple Independent Events of Default Under the ET Loan Documents

119. The ET Note, Loan Authorization and Agreement, Security Agreement, and related documents define several independent events of default. At least five of them occurred.

120. First, Martin's conviction and life sentence were an adverse change in financial condition and business operation materially affecting ET's ability to pay under Note Paragraph 7(K), and a criminal action materially affecting the borrower's ability to pay under Note Paragraph 7(N).

121. Second, James's unauthorized transfer of collateral to Elite, without the SBA's prior written consent, was an independent default under Note Paragraph 7(C), which applies when the borrower sells or transfers collateral or fails to preserve or account for collateral or proceeds to the SBA's satisfaction.

122. Third, the Airlink SBA loan default was an independent default under Note Paragraph 7(B), which treats default on another SBA loan as an event of default.

123. Fourth, ET ceased operating as ET after Martin's arrest and the diversion of its assets to Elite, an adverse change in business operation under Note Paragraph 7(K).

124. Fifth, James's transfer of collateral without the SBA's prior written consent breached the Loan Authorization and Agreement's collateral restrictions, triggering default under Note Paragraph 7(A) for failure to comply with the loan documents.

125. These were not mere payment defaults. Whatever temporary monthly payments James or Elite made did not cure the collateral transfer, the cessation of ET's operations, the cross-default, the unauthorized transfer, or the adverse-change defaults.

126. At least the unauthorized transfer and the cross-default were self-executing contractual defaults. Once the triggering events occurred, the ET loan was in default, regardless of whether the SBA's internal systems said so and regardless of whether someone kept up the monthly payments for a time.

FIRST AMENDED COMPLAINT

127. The post-default collateral remedies mattered because they were the only practical way to preserve value while the collateral remained identifiable, located, and usable. By sitting on its hands after actual notice, the SBA, alongside the private defendants, allowed that value to be consumed, depreciated, commingled, or converted into Defendants' revenue.

**I. Written Notice to the SBA and the SBA's Inaction**

128. On June 28, 2023, written notice was sent to the SBA at covideidlservicing@sba.gov. The notice identified SBA Loan No. 5632277910 to ET, the $270,600.00 loan amount, and the loan defaults.

129. The June 28, 2023 notice told the SBA that Martin had been sentenced to life in prison, that ET was no longer operating, and that James, a personal guarantor on the loan, had taken all of ET's business assets and moved them to Elite.

130. The notice named Elite and gave its address: 5808 Telephone Road, Suite 200, Ventura, California 93003. It identified Cohen as James's new business partner. It explained that James and Cohen were operating Elite with the very equipment securing the ET loan, and that James had no cash or other assets apart from that equipment.

131. The June 28, 2023 notice expressly asked the SBA to act at once to secure and pursue the identified collateral, because Martin, serving a life sentence, could not repossess, preserve, market, sell, or liquidate it himself.

132. The notice also offered to give the SBA an inventory sheet listing most of the equipment securing the ET loan.

133. On June 28, 2023, the same day, the SBA's Covid EIDL Servicing Center acknowledged receipt, assigned CSH Email ID: 0008002363897, and stated that the request had been received and forwarded to the appropriate department for review.

134. Despite that actual written notice, the SBA did nothing meaningful to protect, recover, preserve, or liquidate the collateral. It never meaningfully contacted Martin about recovery. It did not pursue James, Cohen, or Elite. It did not exercise its UCC

26

FIRST AMENDED COMPLAINT

remedies. It did not demand the return or accounting of collateral. It did not preserve the security that protected Martin's guarantor position.

135. The SBA's inaction emboldened the private defendants. After the SBA ignored the June 28, 2023 notice, Defendants kept possessing, operating, collecting revenue from, and monetizing the collateral, never accounting for it and never applying its value to reduce Martin's exposure.

136. The SBA's post-notice inaction and the private defendants' post-notice retention of collateral are two faces of one injury. Martin was caught in the middle: the federal creditor kept its right to collect from him, while the private defendants kept their ability to profit from the collateral.

**J. Current Delinquency, Returned Payments, and Concrete Collection Exposure**

137. On or about March 16, 2026, nearly three years after receiving written notice of the collateral diversion and the multiple defaults, the SBA issued a Notice of Delinquency to ET for SBA Loan No. 5632277910, stating that the loan was past due for two payments totaling $2,736.00, with a payment deadline of March 30, 2026.

138. The SBA directed that March 16, 2026 notice to ET at 5808 Telephone Road, Suite 200, Ventura, California 93003, the same address the SBA had been told was Elite's operating location and the place to which the collateral had been moved.

139. As of April 1, 2026, the SBA's MySBA Loan Portal still showed the ET loan as Disbursed Current, notwithstanding multiple non-payment defaults and returned payments. The Payment Activity tab reflected $1,368.00 payments on January 20, February 17, and March 17, 2026, but the February and March payments were returned as Borrower's Check Returned on February 23 and March 23, 2026.

140. Those returned payments reveal that the people controlling the ET/Elite assets could not sustain even the $1,368.00 monthly payment, all while running a revenue-generating sound-production business on the very collateral that secures the loan.

27

FIRST AMENDED COMPLAINT

141. By the SBA statement dated May 15, 2026, matters had worsened. The ET loan showed $5,472.00 due, a February 15, 2026 due date, no last payment amount, $0.00 applied to principal, $0.00 applied to interest, and an outstanding balance of $267,022.99.

142. The arrearage doubling from $2,736.00 to $5,472.00 is not a hypothetical injury. It is active, concrete, present, and tethered to collateral that Defendants possess, use, and monetize. Martin faces collection exposure now, not in some abstract future.

143. If the ET loan is referred to the U.S. Department of the Treasury or other collection mechanisms, Martin faces administrative offsets, collection fees, penalties, tax-refund interception, Social Security offset, administrative wage garnishment where applicable, and other federal collection activity. The Airlink loan has already gone to collections, proving that this federal collection exposure is real, not speculative.

144. The injury does not depend on speculation about the SBA's independent choices. It flows from Defendants' possession and use of the collateral, the SBA's refusal to protect that collateral after notice, the returned payments, the active delinquency, the existing balances, and Martin's present guarantor and borrower exposure.

145. The continuing delinquency also refutes any suggestion that the collateral is being preserved or that the private defendants have protected the SBA debt. They hold the assets and the revenue platform, yet the federal debt remains unpaid and delinquent.

**K. The Unconditional Guarantee Waivers Do Not Bar Martin's SBA Claims as Pleaded**

146. The Unconditional Guarantee contains broad waiver provisions, addressing failure to perfect or maintain a security interest, changes in collateral value, neglect or impairment of collateral, failure to seek payment from collateral first, impairment of suretyship rights, and the SBA's exercise of its rights under the loan documents.

147. None of those waivers bars Martin's claims as pleaded. Martin does not contend that the SBA had to elect a single remedy the instant default occurred, or that it

FIRST AMENDED COMPLAINT

had to exhaust collateral before any other remedy in every ordinary case. He contends that the SBA acted in bad faith and with gross neglect after receiving actual written notice that identified the default, the wrongdoers, the collateral, the transferee, the address, and Martin's physical inability to act.

148. The loan documents specify that federal law governs when the SBA holds the note. Under federal common law and equitable suretyship principles, a creditor who willfully or with gross negligence fails to preserve collateral after actual notice may discharge a guarantor to the extent of the resulting prejudice.

149. The Note and Security Agreement gave the SBA post-default rights to take possession of the collateral, sell or dispose of it, and act to protect the collateral or collect the debt. UCC § 9-609 and Cal. Com. Code § 9609 likewise recognize a secured party's post-default right to take possession.

150. Guarantee Section 7 does not immunize the SBA. It addresses collateral pledged by guarantors to secure the Guarantee. The collateral at issue here is borrower collateral, pledged by ET under the Security Agreement and Amended Security Agreement. The SBA cannot stretch a guarantor-collateral provision to disclaim all responsibility for grossly neglecting borrower collateral after notice.

151. The whole purpose of the collateral was to furnish a repayment source that reduced Martin's guarantor exposure. By refusing to act after actual notice, the SBA let the collateral depreciate, vanish, commingle, or be monetized by Defendants, while it preserved its own ability to pursue Martin personally.

**L. Martin's Direct Injuries, Traceability, and Redressability**

152. Martin's injuries are direct and personal. He seeks recovery for his own money paid or transferred, his own 90 percent ownership and control rights, his own consent rights, his own compensation and distribution rights, his own sale proceeds, his own guarantor exposure, his own exoneration, reimbursement, indemnity, and subrogation rights, and his own interest in traceable proceeds and substitute property.

29

153. Martin does not seek, individually, damages consisting solely of the depletion of assets owned only by a separate entity. He pleads the entity assets for concrete reasons: they were pledged as collateral securing federal debt on which he is personally exposed; they were bought with Airlink funds tied to his personal SBA exposure; their transfer impaired his personal rights; and their value, sale proceeds, revenues, and traceable substitutes should reduce his personal liability.

154. The injury traces directly to Defendants. James induced the Airlink advances, shielded himself from Airlink liability, paid himself while Martin received nothing, transferred the collateral to Elite, and kept operating through Elite. Natalie supplied the threatened-accusation leverage, the accounting knowledge, and the operational continuity. Cohen supplied the capital, structure, and acquisition participation. ALS supplied capital, credit, and business support. Elite received, operated, and monetized the assets and collateral.

155. The injury also traces to the SBA. The SBA received written notice, held the rights of a perfected secured creditor, knew Martin could not pursue the collateral himself, and yet did nothing to preserve its value while keeping Martin on the hook.

156. The injury is redressable. Avoidance of the transfers, return of collateral, constructive trust, equitable lien, restitution, disgorgement, indemnity, reimbursement, exoneration, subrogation, declaratory relief, accounting, tracing, and damages would restore or monetize the collateral, shift liability to the wrongdoers, reduce Martin's SBA exposure, and settle his obligations to the SBA.

157. Martin does not rest on speculation that the SBA might someday act. The ET loan is past due with an outstanding balance of $267,022.99. The Airlink loan is already in collections with an approximate $1,700,000.00 balance. Defendants hold or control collateral and proceeds that can reduce those exposures now.

158. Civil RICO permits recovery for business or property injury even when that loss derives from or follows a personal-injury event. Medical Marijuana, Inc. v. Horn, 604 U.S. 593, 599-605 (2025). Martin pleads only recoverable business and property

30

FIRST AMENDED COMPLAINT

losses: money, property, payments, points, ownership rights, collateral value, sale consideration, proceeds, revenue, and guaranty-protection rights.

159. The documentary proof needed to establish and trace these injuries lies largely in Defendants' hands: Signal messages, text messages, Zelle and bank records, Chase credit-card statements and reward records, tuition records, travel records, ET and Airlink books, Elite books, ALS capitalization records, merchant accounts, customer and vendor records, transaction documents, loan records, and intercompany transfer records.

160. To the extent Defendants claim the money, collateral, or proceeds were commingled, substituted, spent, depreciated, or passed onward, those facts support, rather than defeat, equitable tracing, accounting, constructive trust, equitable lien, unjust enrichment, voidable-transfer, and declaratory relief.

**M. The RICO Enterprise, Pattern, Predicate Acts, and Continuing Injury**

161. From at least April 2019 forward, and continuing through the November 26, 2022 transfer and the ensuing retention, use, and exploitation of the assets, collateral, proceeds, and substitute property, an association-in-fact enterprise existed among James, Natalie, Cohen, ALS, Elite, and other participants according to proof.

162. The Enterprise was distinct from any single defendant. It had an ascertainable structure, stable core relationships, a shared unlawful purpose, phase-specific roles, and enough longevity to pursue that purpose across several years.

163. The Enterprise's purpose was to extract money and benefits from Martin, use the resulting leverage and his forced absence to seize his business, collateral, control rights, sale rights, and proceeds, and then operate and monetize the business and collateral through Elite and ALS while leaving Martin exposed on federal debt.

164. Each member played a complementary role. Natalie supplied the threats, the timing, the leverage, the Signal and private communications, and her knowledge of Martin's fear of accusation. James supplied insider access, business control, collateral access, benefit retention, and beneficiary status. Cohen supplied outside capital, business participation, acquisition structure, operational direction, and control of ALS. ALS

FIRST AMENDED COMPLAINT

supplied capital, credit, accounts, resources, and business infrastructure. Elite supplied the vehicle to acquire, operate, collect revenue, hold collateral, and monetize it all.

165. The Enterprise affected interstate commerce through cellular calls, Signal messages, text messages, emails, banks, Zelle transfers, Chase credit-card transactions, rewards points, electronic funds transfers, online vendors, travel vendors, school tuition payments, customer and vendor relationships, commercial sound-production work, SBA disaster-loan funds, and the continuing operation of a commercial event-production business.

166. The Enterprise carried out a pattern of racketeering activity through repeated acts of extortion and attempted extortion: threats to accuse Martin of a crime, to injure his character, to imprison him, and to destroy his business relationships unless he paid money or conferred economic benefits. These predicate acts are chargeable under California Penal Code §§ 518, 519, 523, and 524, and constitute extortion or attempted extortion affecting interstate commerce under 18 U.S.C. § 1951.

167. The predicate acts include the representative episodes alleged above, on or about April 11, 2019; September 26, 2019; January 2020; July 30, 2020; October 2020; June 28, 2021; and October 31 through November 3, 2021, together with the related demands, Signal, text, and phone communications, Zelle transfers, Chase credit-card charges, points, tuition payments, travel charges, cash transfers, and other benefits.

168. The predicate acts were related. They shared the same victim, the same core participants, the same threatened-accusation method, the same private payment and communication channels, the same economic objective, and the same overarching design: to take Martin's money, property, control, business value, collateral value, and, eventually, his business assets.

169. The pattern exhibited closed-ended continuity, because the related extortionate conduct spanned several years, involved repeated acts and transfers, and led directly into the November 2022 asset-transfer phase. It also exhibited open-ended

FIRST AMENDED COMPLAINT

continuity, because Defendants continued after the transfer to operate, collect, route, retain, conceal, and monetize the assets and proceeds the Enterprise had obtained.

170. Cohen, ALS, and Elite were core participants in the takeover and exploitation phase, not passive recipients. By no later than November 2021, and earlier according to proof, Cohen and ALS knowingly took part in and directed the Enterprise's conversion of Martin's forced absence into a business acquisition. Elite was formed, capitalized, and used as the vehicle to receive and monetize the Enterprise's fruits.

171. Even if Cohen, ALS, and Elite did not personally voice every early threat, they knowingly joined, ratified, and conducted the Enterprise's affairs by exploiting the leverage and proceeds the threatened-accusation phase created, by supplying the capital and structure that turned that leverage into a permanent asset transfer, and by continuing to possess, operate, route, collect, conceal, and monetize the traceable property.

172. The Enterprise's later acts, including the financing, structuring, acquisition, transfer, retention, use, routing, monetization, concealment, and commingling of collateral and traceable proceeds, inflicted new and independently direct business and property injuries on Martin.

173. Martin had no access to the books, records, transaction documents, internal communications, financing files, capitalization records, bank records, customer records, valuation records, or transfer records needed to uncover the full roles of Cohen, ALS, and Elite, the financing structure of the takeover, the terms and undervaluation of the November 26, 2022 transfer, or the movement of the proceeds. Defendants concealed those facts, and they remain in Defendants' possession.

174. Martin pleads delayed discovery, concealment, separate accrual, continuing injury, continuing violation, and relation back to the fullest extent the law allows. Should any early coerced-payment injuries fall outside a limitations period, they remain predicate acts, enterprise history, pattern evidence, causation evidence, and background for the timely injuries arising from the November 2022 transfer and the post-transfer retention and monetization.

FIRST AMENDED COMPLAINT

175. The RICO claims rest on none of the protected categories. They are not based on petitioning, official reports, trial testimony, or litigation activity. The racketeering acts are the pre-report threats and demands for money or property, the obtaining of money and property through those threats, the use of interstate payment and communication systems, and the non-petitioning business takeover and monetization of collateral and proceeds.

## FIRST CAUSE OF ACTION

## DECLARATORY RELIEF: EXONERATION OR DISCHARGE OF GUARANTOR

**(Against Defendant SBA)**

**(28 U.S.C. §§ 2201-2202; Federal Common Law; UCC § 9-609; Cal. Com. Code §§ 9609, 9625; Cal. Civ. Code §§ 2819, 2845, 2849, to the extent state law applies)**

176. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

177. An actual controversy exists between Martin and the SBA over his rights and obligations under his Unconditional Guarantee of ET SBA EIDL Loan No. 5632277910. The SBA contends, or will contend, that Martin remains liable as guarantor for the full outstanding balance, interest, fees, penalties, and collection costs.

178. Martin contends the opposite. The SBA received actual written notice and written demand identifying the defaults, the wrongdoers, the transferee, the collateral, its location, the risk of dissipation, and Martin's physical inability to pursue it. The SBA then took no meaningful collateral-protection action for nearly three years, thereby impairing the collateral and discharging, reducing, or exonerating Martin's guarantor liability to the extent of the resulting prejudice.

179. Under federal common law governing SBA lending and under equitable suretyship principles, a creditor who holds a perfected security interest, learns that the collateral has been wrongfully diverted to an identified third party at a known location, knows the guarantor cannot protect it himself, and then does nothing while it is

34

FIRST AMENDED COMPLAINT

dissipated or monetized, is subject to guarantor discharge or reduction to the extent of the prejudice.

180. To the extent Article 9 principles apply, UCC § 9-609 and Cal. Com. Code § 9609 recognize the secured party's post-default right to take possession of collateral, and UCC § 9-625 and Cal. Com. Code § 9625 authorize relief for a secured party's noncompliance. Martin invokes these provisions to show that the SBA held collateral remedies he did not.

181. In the alternative, and only to the extent state law applies, Martin is entitled to exoneration under California Civil Code § 2845, because he required the SBA to pursue a remedy within its power that he could not pursue and that would have lightened his burden, and the SBA neglected to do so after written demand.

182. In the alternative, and only to the extent state law applies, Martin is entitled to exoneration under California Civil Code § 2819, because the SBA's conduct impaired or suspended its remedies and rights against the principal and the collateral without Martin's consent.

183. The waiver provisions in the Unconditional Guarantee do not bar this claim, because Martin alleges federal common-law impairment of collateral, bad faith, gross negligence, breach of secured-creditor and implied-covenant duties, and impairment of borrower collateral after actual notice. He does not seek to force the SBA to elect one collection remedy over another; he seeks a declaration of his own obligations after the SBA destroyed or impaired the collateral protection.

184. Martin seeks a declaration that the ET loan has been in contractual default since the defaults alleged here occurred; that he is exonerated, discharged, or entitled to a reduction of guarantor liability to the extent the SBA's post-notice inaction impaired the collateral; that Guarantee Sections 6.K and 7 do not bar relief on these facts; and that any remaining obligation must be reduced by the value of the collateral the SBA could have preserved after notice.

**SECOND CAUSE OF ACTION**

FIRST AMENDED COMPLAINT

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendant SBA)

185. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

186. The ET loan documents and Martin's Unconditional Guarantee are contracts between Martin and the SBA. This claim arises from that contractual relationship and from the SBA's statutory waiver of sovereign immunity under 15 U.S.C. § 634(b)(1). It sounds in contract, not tort.

187. Every contract carries an implied covenant of good faith and fair dealing. Here, that covenant required the SBA not to exercise its contractual discretion arbitrarily, in bad faith, or in a way that unfairly stripped Martin of his bargained-for benefit of collateral protection.

188. The SBA breached the covenant. It received actual written notice of the collateral diversion and of Martin's inability to act; it ignored the written demand to secure the collateral; it failed for nearly three years to take any action reasonably aimed at preserving the collateral or its value; it let the collateral depreciate, commingle, and generate revenue for Defendants; and it kept its collection rights against Martin alive while neglecting the very repayment source that should have reduced his exposure.

189. Martin does not allege the SBA promised never to pursue him unless it first liquidated the collateral. He alleges that, after actual notice naming the wrongdoers, the collateral, and the location, and while knowing Martin was serving a life sentence and could not protect the collateral himself, the SBA could not in good faith keep his guarantor exposure intact while standing idle as Defendants monetized that collateral.

190. As a direct and proximate result of the breach, Martin suffered damages including increased guarantor liability, interest, penalties, collection exposure, damage to his creditworthiness, lost collateral value, lost guarantor protection, and exposure to Treasury collection.

36

FIRST AMENDED COMPLAINT

191. Martin is entitled to contract damages, declaratory relief, and all other relief the law allows.

## THIRD CAUSE OF ACTION

## CIVIL RICO, 18 U.S.C. § 1962(c)

**(Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)**

192. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

193. Each defendant named in this cause of action is a "person" within the meaning of 18 U.S.C. § 1961(3).

194. The Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). It is distinct from any single defendant and consists of James, Natalie, Cohen, ALS, Elite, and other participants acting as a continuing unit for the common purpose of extracting Martin's money and property, exploiting his forced absence, acquiring the business and collateral at a depressed price, and monetizing the assets and proceeds while leaving Martin exposed on federal debt.

195. The Enterprise affected interstate commerce through banking, Zelle transfers, Chase credit-card transactions, rewards points, electronic payments, Signal messages, interstate communications, online purchases, travel vendors, commercial customers and vendors, SBA disaster-loan funds, and the continuing operation of a commercial sound-production business.

196. Each RICO defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs. James used his insider access, operational control, fiduciary status, and control of the collateral. Natalie used threats, timing, accounting knowledge, Signal and private communications, and operational continuity. Cohen used capital, credit, acquisition structure, business direction, and control over ALS and Elite. ALS supplied capital, credit, accounts, and business infrastructure. Elite served as the

37

FIRST AMENDED COMPLAINT

acquisition vehicle, operating vehicle, revenue collector, collateral holder, and monetization vehicle.

197. The RICO defendants conducted the Enterprise through a pattern of racketeering activity made up of multiple acts of extortion and attempted extortion, including acts chargeable under California Penal Code §§ 518, 519, 523, and 524, and acts constituting extortion affecting commerce under 18 U.S.C. § 1951.

198. Those predicate acts included repeated threats to accuse Martin of a crime, to imprison him, and to injure his character unless he paid money or conferred economic benefits, including the representative episodes alleged here. The threatened-accusation demands obtained money and property and built the leverage and timing that made the later takeover possible.

199. The predicate acts also included the use of private communications and financial channels to demand, obtain, or trace property: Signal messages, text messages, phone communications, Zelle transfers, Chase credit-card charges, Chase rewards points, bank transfers, tuition records, travel charges, and other payment systems. Martin does not allege these channels as a separate wire-fraud predicate; he alleges them as the means, the evidence, the interstate-commerce channels, and the tracing records of the extortion and the enterprise.

200. The predicate acts and the takeover acts that followed were related and continuous. They shared the same victim, the same core participants, the same coercive method, the same economic objective, and the same private communication and payment channels, all in service of one purpose: extract money and leverage from Martin, remove him from control, seize his business and collateral, and turn the assets into a continuing revenue stream.

201. By no later than November 2021, Cohen, ALS, and Elite knowingly joined the Enterprise's takeover phase, using capital, credit, structure, and entity control to convert the coercive opportunity into the November 2022 transfer and the monetization that followed.

FIRST AMENDED COMPLAINT

202. By reason of the § 1962(c) violation, Martin suffered direct injury to business and property. Those injuries include the coerced cash and property transfers; Zelle transfers; Chase credit-card charges; rewards points; tuition, travel, and household payments; the loss of his ownership, control, consent, compensation, distribution, and sale rights; the loss of collateral protection; increased SBA exposure; lost proceeds; lost traceable revenue and substitute property; and impairment of his rights as guarantor, creditor, surety, owner, and person entitled to sale-related consideration.

203. Martin seeks only business and property injuries under RICO. He does not seek RICO recovery for personal injury, emotional distress, incarceration itself, or the depletion of entity assets, except to the extent those assets secure his personal exposure, affect his personal economic rights, or generate traceable proceeds belonging to him.

204. The RICO defendants proximately caused Martin's injuries. The Enterprise targeted Martin personally because he controlled the business and the collateral. There is no more immediate victim for his coerced payments, his personal guarantor exposure, his control rights, his sale consideration, or his traceable proceeds.

205. The claim does not arise from protected petitioning, reports, testimony, litigation conduct, or the truth or falsity of any later accusation. It arises from pre-report threats and demands, the property transfers those threats induced, and the non-petitioning seizure of the business and collateral.

206. Martin is entitled to treble damages, costs, attorney's fees if and to the extent authorized by law, and other relief under 18 U.S.C. § 1964(c).

## FOURTH CAUSE OF ACTION
## CIVIL RICO CONSPIRACY, 18 U.S.C. § 1962(d)
**(Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)**

207. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

FIRST AMENDED COMPLAINT

208. The RICO defendants knowingly agreed to facilitate, advance, or take part in the Enterprise and in the violation of 18 U.S.C. § 1962(c). The agreement assigned phase-specific roles: James and Natalie created and maintained the threatened-accusation leverage; Cohen knowingly supplied capital, structure, business participation, and acquisition direction; ALS supplied resources, credit, accounts, and structure; and Elite received and monetized the assets, collateral, and proceeds.

209. Each defendant knew the essential nature and scope of the Enterprise. James and Natalie knew the early threatened-accusation and payment-extraction phase. Cohen, ALS, and Elite knew, by the time they committed resources, that the objective was to exploit Martin's forced absence, capitalize Elite, acquire the assets at a depressed value, and keep the resulting revenues, collateral, and proceeds.

210. Overt acts in furtherance of the conspiracy included the repeated threatened-accusation demands; the Signal, text, phone, Zelle, Chase-card, points, tuition, travel, and bank-transfer conduct; James's acceptance and ratification of the benefits; Natalie's November 3, 2021 question about how the Walds would get the company if something happened to Martin; the scramble within days of Martin's arrest to obtain financing; Cohen's use of ALS capital and resources; the capitalization and operation of Elite; the pressure on Donna; the procurement of the November 26, 2022 transfer; and the continued operation and monetization of the assets through Elite.

211. The conspiracy continued through the November 26, 2022 transfer and beyond, as Defendants kept possessing, operating, collecting, routing, concealing, and monetizing the assets, collateral, receivables, revenues, proceeds, and substitute property.

212. By reason of the § 1962(d) conspiracy, Martin suffered direct injury to business and property as alleged here.

213. Martin is entitled to treble damages, costs, attorney's fees if and to the extent authorized by law, and other relief under 18 U.S.C. § 1964(c).

**FIFTH CAUSE OF ACTION**

40

FIRST AMENDED COMPLAINT

## BREACH OF FIDUCIARY DUTY

### (Against Defendant James Wald)

214. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

215. As Martin's business partner, ET member, operational manager, co-guarantor, and the person exercising control over ET's operations and assets, James owed Martin fiduciary duties, including duties of loyalty, care, good faith, fair dealing, full disclosure, and avoidance of self-dealing. Cal. Corp. Code § 17704.09.

216. Martin brings this claim in his individual capacity, for injury to his direct personal interests as majority owner, co-member, co-guarantor, and holder of personal control, consent, compensation, distribution, sale, indemnity, exoneration, reimbursement, and subrogation rights.

217. James breached those duties on multiple fronts. He induced Airlink to advance $528,231.37 to ET for equipment, then insulated himself from personal Airlink liability. He paid himself a $600.00 per diem while Martin drew no income. He diverted ET and Airlink-funded assets to Elite without authorization. He caused or joined a transfer for only $215,000.00. He used the assets in a competing enterprise for his own benefit, concealed the transfer and use of the collateral, and left Martin exposed on SBA debt while he monetized the collateral.

218. James's breach was knowing, willful, and in bad faith. He knew Martin held 90 percent ownership and control. He knew the assets were subject to SBA liens and Airlink funding. He knew both he and Martin were guarantors on the ET loan. And he knew Martin was incarcerated and powerless to protect his interests, so he exploited that helplessness.

219. As a direct and proximate result of James's breach, Martin suffered damages to be proven at trial, including the loss of collateral protection, the $267,022.99 ET loan exposure, the approximately $1,700,000.00 Airlink loan collection exposure, the

41

FIRST AMENDED COMPLAINT

impairment of the Airlink-funded equipment, lost sale consideration, lost compensation and distributions, lost control rights, and lost traceable proceeds.

220. James acted with fraud, malice, oppression, and conscious disregard of Martin's rights, entitling Martin to punitive damages to the extent the law permits.

## SIXTH CAUSE OF ACTION
## VOIDABLE TRANSACTION
**(Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)**
**(Cal. Civ. Code §§ 3439.04, 3439.05, 3439.07, 3439.08)**

221. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

222. Martin is a creditor within the meaning of the Uniform Voidable Transactions Act. He holds contingent, unmatured, equitable, and legal claims for indemnity, reimbursement, exoneration, restitution, subrogation, and recovery of proceeds, all arising from the ET loan, the Airlink-funded equipment, his personal guaranty exposure, and the transfer of the collateral and economic rights.

223. The transfer of ET's assets, the Airlink-funded assets, the collateral, receivables, customer relationships, business opportunities, goodwill, proceeds, and substitute property to Elite, ALS, Cohen, James, Natalie, or their nominees is a transfer within the meaning of California Civil Code § 3439.01.

224. The transfer was voidable under California Civil Code § 3439.04(a)(1) because Defendants made it with actual intent to hinder, delay, or defraud Martin and other creditors. The badges of fraud are abundant: transfer to insiders and aligned parties; grossly inadequate consideration; Martin's removal and inability to protect his rights; the pressure on Donna; the concealment from Martin; the retention of possession and control by James, Cohen, ALS, and Elite; insolvency or inability to pay debts; and the transferees' continued use of the assets.

42

FIRST AMENDED COMPLAINT

225. The transfer was also voidable under California Civil Code §§ 3439.04(a)(2) and 3439.05, because neither ET nor Martin received reasonably equivalent value, the business was left unable to pay its debts, and the transfer occurred just as Martin's rights and collateral protection were being stripped away.

226. The $215,000.00 consideration, or similar depressed consideration according to proof, was not reasonably equivalent value for a business with approximately $1,438,000.00 in total value, and approximately $346,000.00 in 2022 profit.

227. The separate discounted equipment transfer alleged here, if proven, is likewise voidable to the extent it diverted value from ET, Airlink, the SBA collateral base, or Martin's personal rights for the benefit of Elite, James, Cohen, ALS, or their business relationships.

228. Martin seeks avoidance of the transfer to the extent necessary to satisfy his claims; attachment or other provisional remedy against the transferred assets; judgment for the value of the transferred assets against the transferees; constructive trust; equitable lien; accounting; tracing; and all other relief authorized by California Civil Code §§ 3439.07 and 3439.08.

## SEVENTH CAUSE OF ACTION

## RESTITUTION, DISGORGEMENT, AND MONEY HAD AND RECEIVED

## (Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)

229. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

230. Defendants received and kept benefits that in equity and good conscience belong to Martin: coerced cash and property transfers, Zelle transfers, Chase credit-card charges, rewards points and cash-equivalent benefits, tuition, travel, goods, services, collateral, sale consideration, receivables, job revenues, commissions, profits, distributions, customer-value proceeds, equipment value, Airlink-funded equipment value, and substitute property.

43

FIRST AMENDED COMPLAINT

231. James and Natalie took and kept the money and household benefits extracted through threatened accusation and menace. James, Natalie, Cohen, ALS, and Elite took or kept the value generated by the takeover, the transfer, and the possession, operation, routing, and monetization of the assets and collateral.

232. Cohen, ALS, and Elite knowingly received and retained assets, collateral, revenue, proceeds, and substitute property traceable to Martin's own money, personal rights, sale rights, collateral-protection rights, and Airlink-funded equipment, and they did so knowing the value had been obtained through pressure, undervaluation, and Martin's inability to protect himself.

233. The amounts received and retained are ascertainable from Signal messages, text messages, bank records, Zelle records, payment records, Chase credit-card reports, rewards-points records, tuition records, travel records, invoices, customer and vendor records, the November 2022 sale documents, formation and capitalization records, ALS records, Elite books, merchant accounts, payroll records, and intercompany transfer records.

234. Defendants' retention of those benefits is unjust. They obtained and used the assets and proceeds while leaving Martin personally exposed to federal SBA debt, and they withheld value that should have gone to Martin, been returned to ET or Airlink, or been applied to reduce his SBA exposure.

235. Martin seeks restitution, disgorgement, money had and received, accounting, constructive trust, equitable lien, tracing, prejudgment interest, and all other equitable relief necessary to prevent Defendants from keeping his money, collateral, proceeds, and property.

**EIGHTH CAUSE OF ACTION**

**CIVIL CONSPIRACY**

**(Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)**

FIRST AMENDED COMPLAINT

236. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

237. Civil conspiracy is not pleaded as an independent tort. It is pleaded as a basis for joint and several liability for Defendants' knowing participation in the underlying torts and equitable wrongs: James's breach of fiduciary duty, the voidable transfer, the fraud-based pressure on Donna, the restitutionary wrongs, the menace and duress by James and Natalie, and the wrongful retention and monetization of the collateral and traceable proceeds.

238. Defendants formed a conspiracy and acted in concert toward a common purpose: extract money from Martin, exploit his removal, acquire his business and collateral for only $215,000.00 or other grossly inadequate consideration, keep operating and profiting from the collateral, and leave Martin exposed on federal SBA debt.

239. Overt acts in furtherance of the conspiracy included the threatened-accusation demands; the Signal, text, phone, Zelle, Chase-card, rewards-points, tuition, travel, and bank-transfer conduct; the acceptance and retention of benefits; the efforts to obtain financing; the use of ALS resources; the formation and capitalization of Elite; the pressure on Donna; the misrepresentations about ET's value; the procurement of the November 26, 2022 sale; the discounted transfers; the transfer of collateral; the continued operation of the business; and the collection, routing, retention, and monetization of the revenues and proceeds.

240. As a direct and proximate result of the conspiracy, Martin suffered damages to be proven at trial, including guarantor exposure, lost collateral value, lost sale consideration, lost personal economic rights, lost compensation and distributions, lost control rights, and lost traceable proceeds.

241. Defendants acted with fraud, malice, oppression, and conscious disregard of Martin's rights, entitling Martin to punitive damages to the extent the law permits.

**NINTH CAUSE OF ACTION**

**INDEMNITY, REIMBURSEMENT, AND EXONERATION**

FIRST AMENDED COMPLAINT

**(Against Defendant James Wald)**

**(Cal. Civ. Code §§ 2847, 2848, 2849; Federal Common Law)**

242. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

243. Martin and James are co-guarantors on the ET SBA loan. James's wrongful conduct directly caused or materially increased Martin's personal exposure: he induced the Airlink advances, insulated himself from Airlink liability, diverted the collateral, ran a competing business on that collateral, failed to preserve or apply its value, failed to sustain the payments, and profited from the diverted business.

244. Under California Civil Code § 2847, when a surety satisfies the principal obligation, in whole or in part, the principal must reimburse what the surety disbursed, including necessary costs and expenses. Under California Civil Code § 2848, a surety who satisfies the obligation may enforce every remedy the creditor held against the principal.

245. To the extent Martin must make any payment on the ET loan, whether voluntarily or through SBA or Treasury collection, he is entitled to reimbursement from James, together with costs, expenses, interest, and related collection damages.

246. Under equitable exoneration, James may be compelled to exonerate Martin before the obligation is paid, because James's wrongful conduct substantially caused the obligation to come due, stripped the collateral, and materially increased Martin's exposure.

247. Martin is further entitled, upon payment or by equitable order, to be subrogated to the SBA's rights as secured creditor and to enforce the SBA's UCC lien and related remedies against the collateral and traceable proceeds held by James, Elite, Cohen, ALS, Natalie, or their nominees.

248. Martin seeks indemnity, reimbursement, contribution in the alternative, exoneration, subrogation, costs, expenses, interest, accounting, and all related equitable

46

FIRST AMENDED COMPLAINT

relief necessary to shift the guaranty burden onto the wrongdoer whose conduct created or magnified it.

## TENTH CAUSE OF ACTION

## DECLARATORY RELIEF RE COLLATERAL, PROCEEDS, AND TRACEABLE PROPERTY

**(Against Defendants James Wald, Natalie Wald, Jayson Cohen, American Legacy Solutions LLC, and Elite Sound Company LLC)**

**(28 U.S.C. §§ 2201-2202)**

249. Martin incorporates by reference all preceding paragraphs as though fully set forth herein.

250. An actual and present controversy exists between Martin and the private defendants over the ownership, possession, control, use, revenue, sale consideration, proceeds, substitute proceeds, and other economic benefits traceable to Martin's money, personal rights, guarantor-protection rights, Airlink-funded equipment, and the collateral securing the SBA loans.

251. Martin contends that Defendants wrongfully obtained, retained, used, and monetized collateral and proceeds that should be returned, applied to the SBA loans, held in constructive trust, subjected to an equitable lien, accounted for, traced, or paid to him. Defendants dispute, or will dispute, those contentions.

252. A declaration is necessary to fix the parties' present rights and obligations, including whether Defendants hold collateral or proceeds subject to constructive trust, equitable lien, restitution, avoidance, tracing, accounting, exoneration, reimbursement, indemnity, subrogation, or other equitable relief.

253. Martin seeks a declaration identifying the categories of collateral, money, consideration, proceeds, substitute proceeds, revenues, rewards points, and other property or economic benefits belonging to him or traceable to his rights; declaring that Defendants hold no superior equitable claim to that property to the extent it was obtained through the conduct alleged here; and declaring his right to restitution, tracing,

FIRST AMENDED COMPLAINT

accounting, constructive trust, equitable lien, exoneration, reimbursement, indemnity, and related relief.

254. Such declaratory relief will redress Martin's injuries by determining who must bear the SBA-related burden, who must return or account for the collateral and proceeds, and how the collateral value must be applied to reduce his personal exposure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Travis Edward Martin prays for judgment as follows:

A. On the First Cause of Action, a judicial declaration that the ET loan has been in contractual default since the default events alleged herein; that Martin is exonerated, discharged, or entitled to reduction of guarantor liability to the extent of the SBA's collateral impairment; that the waiver provisions do not bar that relief; and that any remaining obligation must be reduced by the value of collateral the SBA could have preserved after notice;

B. On the Second Cause of Action, compensatory damages against the SBA for breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial, together with all contract remedies allowed by law;

C. On the Third and Fourth Causes of Action, treble damages under 18 U.S.C. § 1964(c), costs of suit, attorney's fees if and to the extent authorized by law, and all other RICO relief available against James, Natalie, Cohen, ALS, and Elite;

D. On the Fifth Cause of Action, compensatory and punitive damages against James for breach of fiduciary duty in an amount to be proven at trial;

E. On the Sixth Cause of Action, avoidance of the transfers to the extent necessary to satisfy Martin's claims, attachment or other provisional remedy against transferred assets, judgment for the value of the assets transferred, constructive trust, equitable lien, accounting, tracing, and all other relief authorized by the UVTA;

F. On the Seventh Cause of Action, restitution, disgorgement, money had and received, accounting, tracing, constructive trust, equitable lien, prejudgment interest, and other equitable relief against James, Natalie, Cohen, ALS, and Elite;

FIRST AMENDED COMPLAINT

G. On the Eighth Cause of Action, compensatory and punitive damages against the private defendants for civil conspiracy, to the extent permitted by law;

H. On the Ninth Cause of Action, indemnity, reimbursement, contribution in the alternative, exoneration, equitable subrogation, costs, expenses, and an order compelling James to satisfy the ET loan or return and apply collateral value sufficient to exonerate Martin;

I. On the Tenth Cause of Action, a declaration of the parties' rights in collateral, money, sale consideration, proceeds, substitute proceeds, revenues, rewards points, and other property or economic benefits traceable to Martin's transfers, guarantor-protection rights, Airlink-funded equipment, SBA collateral, and personal economic rights;

J. Imposition of a constructive trust and equitable lien on all collateral, Airlink-funded assets, transferred assets, proceeds, substitute proceeds, revenues, profits, receivables, rewards points, and traceable property held by Defendants or their nominees;

K. An accounting of all money, payments, Zelle transfers, bank transfers, Chase credit-card charges, rewards points, tuition payments, travel charges, asset transfers, receivables, revenues, profits, commissions, intercompany transfers, collateral, proceeds, and substitute property received, retained, transferred, spent, routed, or monetized by Defendants;

L. Prejudgment and postjudgment interest as allowed by law;

M. Costs of suit;

N. Punitive and exemplary damages against the private defendants where permitted by law and in an amount sufficient to punish and deter;

O. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable as of right.

Dated: May 23, 2026

Respectfully submitted,

FIRST AMENDED COMPLAINT

TRAVIS EDWARD MARTIN, Pro Per

Plaintiff In Propria Persona

50

FIRST AMENDED COMPLAINT